# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 21, 2008      Decided December 16, 2008

No. 04-1335

BRAINTREE ELECTRIC LIGHT DEPARTMENT, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

ISO NEW ENGLAND INC., ET AL.,
INTERVENORS

Consolidated with 05-1210, 05-1212, 06-1144

On Petition for Review of Orders
of the Federal Energy Regulatory Commission

*John P. Coyle* argued the cause and filed the briefs for petitioners.

*Colleen Mary McConnell*, Assistant Attorney General, Attorney General's Office for the Commonwealth of

Massachusetts, and *Bruce C. Johnson*, Attorney, Office of Consumer Counsel, were on the brief for intervenors in support of petitioners. *Joseph W. Rogers*, Assistant Attorney General, Attorney General's Office for the Commonwealth of Massachusetts, entered an appearance.

*Beth G. Pacella*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief were *Cynthia A. Marlette*, General Counsel, and *Robert H. Solomon*, Solicitor. *John P. Coyle*, Attorney, entered an appearance.

*Howard H. Shafferman* and *Daniel R. Simon* were on the brief for intervenor ISO New England Inc.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: This appeal presents the issue of whether the Federal Energy Regulatory Commission may approve rates filed by a Regional Transmission Organization ("RTO") to cover the cost of activity that for some purposes may be classified as lobbying. Rejecting petitioners' contentions that approval of the rates was arbitrary and capricious and violated their First Amendment rights, we affirm FERC's orders.

* * *

Since 1996, in an effort to facilitate the development of competitive wholesale power markets, FERC has required power utilities to provide non-discriminatory open access transmission services. To this end it has encouraged creation

of RTOs—entities consolidating control of all transmission services in a particular region. *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities*, 61 Fed. Reg. 21,540, 21,667 (1996) ("Order No. 888") ("We continue to support the development of [RTOs]"). But the Commission found that the requirement of non-discriminatory access did not fully accomplish its efficiency goals. See *Regional Transmission Organizations*, 65 Fed. Reg. 810, 817 (2000) ("Order No. 2000") (detailing inefficiencies that remained after Order No. 888). Hence, in Order No. 2000, the Commission stepped up the pressure, requiring transmission-owning utilities either to participate in an RTO or to explain their failure to do so. See 18 C.F.R. § 35.34(a), (c), (g), (h); *Regional Transmission Organizations*, 65 Fed. Reg. at 812.

Order No. 2000 required all RTOs to meet a minimum independence requirement, but allowed RTOs to assume "different organizational forms" in order to satisfy the independence characteristic. *Regional Transmission Organizations*, 65 Fed. Reg. at 811 ("the Commission is not proposing a 'cookie cutter' organizational format"). Among the forms explicitly approved in Order No. 2000, see *id*. at 836, was one that FERC had noted in Order No. 888, an independent system operator or "ISO." This would "separate operation of the transmission grid and access to it from economic interests in generation" and provide what the Commission called "operational unbundling." *Order No*. 888, 61 Fed. Reg. at 21,551–52 n.115 & 21,594 n.41 (internal quotations omitted).

The RTO involved in the present case is operated under just such an arrangement. It originated in 1971 with the formation of the New England Power Pool ("NEPOOL"), which in 1997 obtained FERC approval for the creation of ISO New England Inc. ("ISO-NE"), a "private, non-profit

entity to administer New England energy markets and operate the region's bulk power transmission system." *NSTAR Electric & Gas Corp. v. FERC*, 481 F.3d 794, 796 (D.C. Cir. 2007). Ultimately ISO-NE requested approval to establish itself as an RTO under Order No. 2000. FERC gave its approval in 2004, relying, in part, on the fact that as a "not-for-profit entity governed by an independent, non-stakeholder board," ISO-NE met Order No. 2000's independence requirement. *ISO-NE*, 106 FERC ¶ 61,280 at P 51, order on reh'g, 109 FERC ¶ 61,147 (2004), aff'd sub nom. *Maine Pub. Utilities Comm'n v. FERC*, 454 F.3d 278 (D.C. Cir. 2006).

As a FERC-authorized RTO, ISO-NE is required to submit its tariff to FERC for approval under § 205 of the Federal Power Act, 16 U.S.C. § 824(d). The tariff is meant to establish rates that will provide customers with "open access to the regional transmission system to all electricity generators . . . in a non-discriminatory manner." *Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1364 (D.C. Cir. 2004). Section 205 requires that the rates be "just and reasonable."

At issue in the current proceeding are the tariff sheets ISO-NE submitted for FERC approval covering its 2005 and 2006 revenue requirements. In each tariff ISO-NE sought over two million dollars in funding for accounts associated with "Government Affairs," "Public Information," and "Regulatory Affairs" (collectively, "external affairs"). See *ISO-NE,* 109 FERC ¶ 61,383 at P 18 (2004); *ISO-NE*, 113 FERC ¶ 61,341 at P 10 (2005). These accounts were elements of total administrative budgets exceeding $100,000,000 a year. See *ISO-NE*, 109 FERC ¶ 61,383 at P 3; *ISO-NE*, 113 FERC ¶ 61,341 at P2.

In response to both tariffs, petitioners Braintree Electric Light Department, Reading Municipal Light Department, and

Taunton Municipal Lighting Plant (collectively, "BRT")—all ISO-NE customers—intervened and argued that further information was required to determine if the costs ISO-NE sought to recover for external affairs were just and reasonable within the meaning of § 205. In particular, it pointed to reports that lobbyists engaged by ISO-NE had filed with the U.S. Congress under § 5 of the Lobbying Disclosure Act of 1995 (2 U.S.C. §§ 1601–1612 at § 1604), as well as comparable reports filed under state law. BRT argued that these filings showed that ISO-NE's proposed charges included lobbying costs, which BRT said were not permitted under FERC's own precedent and regulations, and that FERC approval in effect compelled subsidization of speech in contravention of the First Amendment.

In response to BRT's complaints, FERC *sua sponte* ordered a "paper hearing" in which it directed ISO-NE to "clarify the nature of each activity listed in the 'lobbying reports' filed by protestors and explain how each of the activities cited by protestors is an educational, informational, or monitoring activity on the one hand, or a lobbying activity on the other." *ISO-NE*, 115 FERC ¶ 61,332 at P 11 n.8 (2006). ISO-NE submitted an almost 800-page filing, comprised of a brief, nine affidavits, and numerous exhibits, arguing that all of its communications with government officials were "designed to address matters of direct operating concern," *i.e.*, "to ensure a reliable bulk-power system and competitive energy markets." *Brief of ISO-NE on Issues Set for Paper Hearing* 5, Joint Appendix ("J.A.") 993.

The Commission rejected BRT's substantive objections, but in a move to enhance transparency ordered ISO-NE to "prepare and post on its website a monthly report concerning 'external affairs' and 'corporate communications.'" *ISO-NE*, 117 FERC ¶ 61,070 at P 52 (2006). On rehearing it made clear that the monthly posting did not have to include certain

ISO-NE communications, such as "inquiries to or from executive branch officials" and the provision of "information to state and federal, executive and legislative officials regarding the status of New England's bulk-power system." *ISO-NE*, 118 FERC ¶ 61,105 at P 39.

On appeal BRT challenges FERC's decision to uphold both the 2005 tariff (Docket No. 05-1210) and the 2006 tariff (Docket No. 06-1144). Before proceeding to the merits, a brief bit of procedural housekeeping is in order. FERC argues that BRT waived its challenge to the 2005 tariff because it failed to advance arguments specific to the 2005 tariff in its opening brief. BRT responds that its arguments against the 2006 orders were equally applicable, and clearly intended to apply with equal force, to the 2005 orders. Since we reject BRT's attacks on FERC's orders covering the 2006 tariff, we need not reach the question of waiver. As to Docket No. 04-1335, BRT admits in its opening brief that it was not briefing the sole issue that it would have raised in that appeal, see Petr. Br. 1 n.2, and accordingly, that petition for review is dismissed with prejudice. See *World Wide Minerals, Ltd v. Republic of Kazakhstan*, 296 F.3d 1154, 1160 (D.C. Cir. 2002). Similarly, as the Massachusetts Municipal Wholesale Electric Company elected not to brief the matters in Docket No. 05-1212, see *Notice of Petitioner Massachusetts Municipal Wholesale Electric Company Regarding Briefing* 1 (Mar. 31, 2008), we dismiss the petition in that docket.

* * *

Apart from the First Amendment challenge, we review FERC's orders under the familiar arbitrary and capricious standard. *Midwest ISO Transmission Owners,* 373 F.3d at 1368 (citing 5 U.S.C. § 706(2)(A)). This requires that we be persuaded that the Commission has made a reasoned decision

based upon substantial evidence and that the path of its reasoning is clear. *NSTAR Electric*, 481 F.3d at 802.

In approving ISO-NE's rates FERC articulated a line between what we may loosely call informational lobbying (recoverable) and more political variants (not recoverable). On the non-recoverable side of the line it identified "activities such as participation in Political Action Committees, candidate fundraising, entertainment expenses (*e.g.*, meals, sporting events, junkets) [as] clearly not recoverable lobbying activities." *ISO-NE*, 117 FERC ¶ 61,070 at P 41. In contrast, it said that "informational and educational activities as well as monitoring and communicating on issues of direct operating concern to the RTO, such as those described by ISO-NE in the present proceeding, are much harder cases," *id.*, which in fact it approved.

BRT asserts two primary reasons to convince us that FERC's approval of the rates as just and reasonable was not based on reasoned decisionmaking: (1) FERC's alleged violation of its own precedent; and (2) its alleged blindness to the possibility that an ISO might pursue goals different from those sought by members, in particular goals not shared by *all* members.

BRT claims that FERC's precedent broadly disallowed recovery for lobbying expenditures, even if informational and related to ISO-NE's core purposes and objectives. FERC acknowledged that its prior statements on the subject had "not always been clear." *Id.* at P 47. This appears quite true. On the one hand is a case cited by BRT, *Delmarva Power & Light Co.*, 58 FERC ¶ 61,169 (1992), order on reh'g, 58 FERC ¶ 61,282 (1992), further order on reh'g, 59 FERC ¶ 61,169 (1992), in which FERC asserted that a utility's lobbying expenses, made in the form of contributions to lobbying activity by Edison Electric Institute, "may not, under any

circumstances, be included in the utility's cost of service." *Delmarva*, 58 FERC ¶ 61,169 at 61,509. On the other hand, not long after *Delmarva* FERC approved the decision of an administrative law judge that allowed for lobbying expenditures where a utility demonstrated that "lobbying related to proposed legislation . . . could benefit . . . ratepayers." *Williams Natural Gas Company*, 73 FERC ¶ 63,015, at 65,072–73 (1995), order on initial decision, 77 FERC ¶ 61,277 (1996), order on reh'g, 80 FERC ¶ 61,158 (1997).

Moreover, FERC's accounting rules have quite clearly left these issues somewhat up in the air. FERC (or more precisely, its predecessor, the Federal Power Commission) had recognized that "political expenditures of utilities fall into a peculiar category" and that it would possibly be "unfair" if such expenditures were presumed recoverable in all instances. *Alabama Power Co.*, 24 FPC 278, 286 (1960), reh'g denied, *Alabama Power Co.*, 24 FPC 860 (1960), aff'd, *Southwestern Elec. Power Co. v. Fed. Power Commission*, 304 F.2d 29 (5th Cir. 1962). As a result, the FPC had required that certain utility expenditures, such as advertising to promote legislation or influence public opinion, be isolated in a special account and thus identified for agency review. In defending this procedure, the FPC had explained that location in that account was definitely not the same as preclusion from recovery. "Thus this accounting classification, while isolating and identifying these controversial expenditures, appropriately avoids any implication that the companies are entitled *without a further showing* to charge against the rate payer the cost of political programs favored by the companies but possibly opposed by those who must pay the costs of supporting these enterprises." *Id*. at 286–87 (emphases added). The present-day version of the account is No. 426.4. See *Expenditures for Political Purposes—Amendment of Account 426, Other Income Deductions, Uniform System of Accounts, and Report*

*Forms Prescribed for Electric Utilities and Licensees and Natural Gas Companies—FPC Forms Nos. 1 and 2*, 30 FPC 1539, 1541 (1963) ("We note also that such classification does not constitute a determination that such expenditures should be excluded from a utility's cost of service in rate proceedings."), order on reh'g, 31 FPC 411 (1964).

Given the Commission's having expressly left open the consequences of placing an expense in Account No. 426.4, it was quite logical, and no diversion from any clear prior pattern, that the Commission here "did not attempt to identify which expenditures should have been classified as lobbying in Account 426.4 because little purpose would be served, in light of our determination that *all* of the expenses were properly recoverable." *ISO-NE*, 118 FERC ¶ 61,105 at P 17 (emphasis in original). The same is true, of course, of expenditure reports that ISO-NE's consultants were required to file with Congress under the Lobbying Disclosure Act of 1995, and similar state provisions.

BRT's second attack on FERC's reasoning points to FERC's statement that "ISO-NE has no interest in obtaining a profit from its operations and seeks only to provide reliable service at the lowest reasonable cost." *ISO-NE*, 118 FERC ¶ 61,105 at P 21. BRT finds this a Pollyannaish view, and observes that there may well be other factors, such as the desire for institutional prestige or ideological biases, "or even a good faith but mistaken belief in the merits of a particular program," Petr. Br. 30, that might lead ISO-NE to sacrifice the interests of its constituents. Moreover, it notes the obvious fact that the interests of those constituents may conflict.

If FERC's ruling below were based entirely on an assumption that ISO-NE must invariably operate in the best interests of its stakeholders solely because it is a non-profit

entity, then we would be inclined to agree with BRT's criticism. Rent-seeking and shirking are surely not confined to for-profit firms. But FERC was hardly as naive as BRT depicts.

First, FERC candidly acknowledged that because ISO-NE was charged with providing system reliability and competitive markets for "*all* market participants," this "necessarily has (and will) result in ISO-NE advocating positions that may be contrary to [those of] some of its individual members." *ISO-NE*, 118 FERC ¶ 61,105 at P 18 (emphasis added). FERC observed that the disputed communications involved in the present case "involved controversial issues on which consensus among market participants in New England, each with their own financial interests, was not possible to achieve." *Id*. It concluded, however, that this lack of consensus "should not preclude ISO-NE from providing its position on issues affecting the New England electricity markets to various officials, including legislators and those in the executive branches of government, who need, and often seek out, ISO-NE as an independent informational resource." *Id*. Given the potential impingement of government action on all stakeholders, we can see nothing arbitrary in FERC's facilitating ISO-NE's efforts to express its perceptions even in the absence of stakeholder unanimity, and even on "highly controversial subject matters." *ISO-NE*, 117 FERC ¶ 61,070 at P 49.

Nor do we see anything unreasonable in FERC's classification of communications for which recovery was proper. ISO-NE plays a critical role in the administration of New England's power markets and it seems eminently reasonable to encourage legislature access to such an informational resource. Similarly, FERC's conclusion allowing recovery of ISO-NE's costs in monitoring legislative

activity, so that it may consider how such activity might affect its operations, appears quite reasonable.

In attacking FERC's remark about ISO-NE's absence of profit motive, and the suggestion that it "seeks only to provide reliable service at the lowest reasonable cost," BRT points to *NSTAR Electric & Gas Corp.*, where we said that FERC had failed to identify "incentives driving ISO-NE to bargain for low prices." 481 F.3d at 803. But there FERC appeared to have abdicated its role of verifying the reasonableness of prices paid by an ISO. Here FERC did investigate the expenditures in question (there is no claim that they were extravagant), reviewing mounds of material from ISO-NE, and found that "no party has provided any evidence that ISO-NE has acted imprudently or contrary to its core purpose and objectives." *ISO-NE*, 118 FERC ¶ 61,105 at P 21. BRT's allegation that FERC *could* act in neglect of its members' aggregated interests appears irrelevant in light of this finding.

BRT's remaining non-constitutional claim is that FERC lacked substantial evidence for its conclusion that ISO-NE's expenditures really did fit on the recoverable side of the line FERC drew. Specifically, BRT argues that FERC's conclusion is undermined by its reliance on what BRT calls ISO-NE's "characterizations" of its communications with governmental bodies, and its decision to proceed by paper hearing.

In fact ISO-NE submitted a detailed mass of its *actual* communications, in the form of speeches, correspondence, PowerPoint presentations and hand-outs. These communications add up to nearly 600 pages, J.A. 1077–1661, and are introduced with a 35-page affidavit by ISO-NE's Director of External Affairs, Carolyn O'Connor, J.A. 1041–75. Far from being characterizations, these *are* ISO-NE's communications. BRT gives us no reason to think there have

been any material omissions, with the possible exception of ISO-NE's relations with FERC itself.

As to those relations, FERC noted that ISO-NE was entitled, like any other utility, to meet with the Commission and other regulators to pursue its legitimate interests. It said, "ISO-NE's contacts with the Commission are strictly regulatory in nature; it is appropriate for ISO-NE as a public utility to recover costs of regulatory contacts." *ISO-NE*, 118 FERC ¶ 61,105 at P 30. FERC's own guidelines entitle ISO-NE "to meet with the Commission . . . to pursue its legitimate interests and to recover the expenses associated with such activities." *Id.* (citing 18 C.F.R. Part 101, Account No. 928 (2006)). And Account 426.4 also explicitly *excludes* "expenditures which are directly related to appearances before regulatory . . . bodies in connection with the reporting utility's existing or proposed operations." See *Expenditures for Political Purposes-Amendment of Account 426*, 30 FPC 1539, 1540 (1963) (internal quotations omitted). Thus, unlike other government communications expenditures, FERC's guidelines already provided that dealings with FERC generally need not be subject to increased scrutiny. The mere possibility that ISO-NE *could have* inappropriately dealt with FERC, which would be inconsistent with the evidence on its dealings with other governmental bodies, neither undermines FERC's conclusions nor calls for additional procedures beyond the "paper hearing." See *Central Maine Power Co. v. FERC*, 252 F.3d 34, 46–47 (D.C. Cir. 2001) (gathering cases where courts have approved "hearings by affidavit and nothing more" so long as any "genuine issues of material fact can be adequately resolved on the written record" (internal quotations omitted)).

13

* * *

BRT argues next that even if FERC's holding was reasonable in light of its precedent and the evidence, FERC's decision that BRT and ISO-NE's other customers must pay for ISO-NE's external affairs expenditures contravenes the First Amendment's prohibition of compelled speech.

In rejecting BRT's claim, the Commission held both that there was no state action, the essential predicate for application of the compelled speech doctrine, *ISO-NE*, 114 FERC ¶ 61,315 at P 26, and also that, even if there were state action, ISO-NE's disputed communications were "germane" to the goals for which it had been created, so that the Commission could lawfully approve the charges without providing dissenters an opt-out right or other remedy, *id*. at P 39.

We pass on the state action issue. On that, FERC relied on the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345 (1974), in which the Court found no state action in state courts' enforcement of a tariff filed by a heavily regulated utility enjoying a state-sanctioned monopoly over the provision of electricity. *Id*. at 351–52; *ISO-NE*, 114 FERC ¶ 61,315 at P 26. On the other hand, the Court held soon after, in *Abood v. Detroit Board of Education*, 431 U.S. 209 (1977), that where a state conditioned state employment on membership in a union, it could not, consistently with the First Amendment, allow the union to coerce dues payments to fund the expression of political or ideological views "not germane to [the union's] duties as collective-bargaining representative." *Id*. at 235–36. *Jackson* was not a First Amendment case, though we are uncertain whether the concept of state action varies with the specific right at stake. In any event, under *Abood* and kindred cases, a government may adopt rules making it very costly for a person to avoid

membership in a group, and yet allow the group to charge members (including dissenters) for the costs of expressing views "germane" to the group's mission. See, e.g., *Keller v. State Bar of Cal.*, 496 U.S. 1, 13 (1990). Given the possibility that customers of a government-sanctioned monopoly might be regarded as analogous, we will assume state action *arguendo* and move directly to germaneness.

Expenditures are "germane" to an organization's purpose where they "are necessarily or reasonably incurred for the purpose" of the organization. *Id.* at 14 (quoting *Ellis v. Railway Clerks*, 466 U.S. 435, 448 (1984)). BRT's argument here largely replicates its earlier contentions about FERC's understanding of ISO-NE's incentives. It argues that the finding of germaneness rests on the "untenable fiction that ISO-NE's interests do not diverge from those of its customers because it does not have a profit motive." Petr. Br. 45. Again it notes our observation in *NSTAR*, 481 F.3d at 803, that FERC had not identified incentives inducing ISO-NE to bargain for low prices.

The argument fails for the same reason that it did in the prior context: FERC did not merely assume that any and all expenditures would be germane to ISO-NE's mission, but reviewed and analyzed the *actual content* of ISO-NE's communications. BRT harps on ISO-NE's having adopted some highly contentious positions, but fails to show why they must be perceived as outside its mission. For example, it points to ISO-NE's position on locational installed capacity and proposed mergers of grid operators as issues that "became controversial largely because ISO-NE is notoriously cost indifferent." See Petr. Br. 29. But FERC directed ISO-NE to develop a locational capacity proposal, see *Devon Power LLC*, 103 FERC ¶ 61,082 at P 37 (2003), order on reh'g, 104 FERC ¶ 61,123 (2003), and at one point directed ISO-NE to attempt to merge with other system operators in the Northeast,

see *Regional Transmission Organizations*, 96 FERC ¶ 61,065 at P 61, 282 (2001) ("the Commission concludes that it is necessary that the three independent system operators in the Northeastern United States combine to form one Regional Transmission Organization"), though it later vacated that order because of subsequent events, *RTO Informational Filings*, 104 FERC ¶ 61,296 at PP 5–7 (2003). No matter what BRT thinks of the positions ISO-NE ultimately adopted on these measures, the fact that FERC at one point thought them necessary to the efficient administration of New England's power markets is strong evidence that they are germane to ISO-NE's mission. Above all, FERC analyzed the content of ISO-NE's communications on various issues, including locational installed capacity, before concluding that "in providing information on these subjects, ISO-NE was attempting to benefit its market participants." *ISO-NE*, 117 FERC ¶ 61,070 at P 49 & n.70.

Thus it is simply not the case that FERC rested its germaneness finding on an assumption that ISO-NE, as a non-profit entity, necessarily worked in the aggregate interests of its customers. Rather, the conclusion was based on its appraisal of the communications in the light of ISO-NE's role in the administration of New England's power supply. We agree with FERC that the approval of ISO-NE's rates did not violate the First Amendment.

\* \* \*

Finally, we turn to BRT's argument that FERC abused its discretion in making clear that its requirement of monthly website disclosures did not encompass "briefings, responses to inquiries, and similar activities" by ISO-NE. *ISO-NE*, 118 FERC ¶ 61,105 at P 39. Perhaps because of the multiplicity of potentially relevant factors and the broad range of choices,

we approach agencies' decisions on remedies with exceptional deference. See, e.g., *Louisiana Public Service Commission v. FERC*, 522 F.3d 378, 393 (D.C. Cir. 2008); *Niagara Mohawk Power Corp. v. FPC*, 379 F.2d 153, 159 (D.C. Cir. 1967).

FERC's theory in excluding such communications was that they were "an integral part of ISO-NE's regulatory or public informational responsibilities and therefore, should not be fettered by additional reporting requirements." *ISO-NE*, 118 FERC ¶ 61,105 at P 39. BRT argues on appeal that because FERC has admitted that the dividing line between educational and informational expenditures on the one hand and lobbying expenditures on the other is not clear, FERC's reporting mandate should be broader, so as to provide the transparency necessary to protect ISO-NE's customers from excess charges.

In light of the substantial deference afforded FERC in this matter, we find that FERC's proposed remedy is reasonable. In its clarification order FERC recognized that the distinction between types of external communications was not easy to draw, and hence refused to allow ISO-NE's own categorization of expenses as either "external affairs" or "corporate communications" to determine what was included in the monthly reporting requirements. *Id.* at P 41. Furthermore, the communications FERC excluded from the reporting requirement included such activities as "questions from Commission staff about uncontested ISO filings" and "providing information to state and federal, executive and legislative officials regarding the status of New England's bulk-power system." *Id.* at P 39. Such exclusions would presumably still require reporting of any meetings ISO-NE is involved in that could promote specific legislation or policy initiatives, which are the primary types of communication BRT seems to find objectionable. Finally, FERC explained that the purpose of its initial order was not to provide

exhaustive lists of information, but rather "to provide stakeholders information regarding the nature of activities undertaken by ISO-NE and, therefore, the opportunity to seek further information from ISO-NE." *Id.* at P 42. FERC thus imposed on ISO-NE the expectation that, "if requested, ISO-NE will provide copies of any documents that it prepared for or distributed at meetings with public officials." *Id.*

As clarified, FERC's posting directive appears to be a reasonable balance of competing interests. ISO-NE has to disclose the most objectionable forms of communications, but will not be unduly bogged down with requirements likely to prove pointless. And of course, if the remedy proves inadequate or ISO-NE fails to comply, BRT is free to pursue additional remedies with FERC.

* * *

The appeals in Nos. 04-1335 and 05-1212 are dismissed (see *supra* at 6), and FERC's orders approving ISO-NE's tariffs for 2005 and 2006 are

*Affirmed.*