# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 29, 2023        Decided July 12, 2024

No. 22-1151

COLUMBIA GULF TRANSMISSION, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

TEXAS EASTERN TRANSMISSION, LP,
INTERVENOR

———

Consolidated with 22-1152, 22-1202, 22-1203

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*John Paul Floom* and *Matthew J. Higgins* argued the causes for petitioners. With them on the briefs were *Sean Marotta* and *Kaci W. Poor.*

*James E. Olson* and *Charlotte H. Taylor* were on the brief for *amicus curiae* TotalEnergies Gas & Power North America, Inc. in support of petitioners.

*Scott R. Ediger*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

*Matthew X. Etchemendy* argued the cause for respondent-intervenor. With him on the brief were *P. Martin Teague*, *Katherine M. O'Connor*, *Jeremy C. Marwell*, *Andrew N. Beach*, *James D. Seegers*, and *Suzanne E. Clevenger*.

Before: PILLARD, WILKINS and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*: We consider the Petitions for Review challenging Federal Energy Regulatory Commission ("FERC" or "the Commission") Orders dismissing complaints by Petitioners Range Resources-Appalachia, LLC ("Range") and Columbia Gulf Transmission, LLC ("Columbia Gulf"). *See* Order Dismissing Complaints, *Range Res.-Appalachia, LLC & Columbia Gulf Transmission, LLC v. Texas Eastern Transmission, LP*, 178 FERC ¶ 61,217 (2022) ("Initial Order"); Notice of Denial of Rehearing by Operation of Law and Providing for Further Consideration, *Range Res.-Appalachia, LLC & Columbia Gulf Transmission, LLC v. Texas Eastern Transmission, LP*, 179 FERC ¶ 62,106 (2022); Order Addressing Arguments Raised on Rehearing, *Range Res.-Appalachia, LLC & Columbia Gulf Transmission, LLC v. Texas Eastern Transmission, LP*, 180 FERC ¶ 61,079 (2022) ("Rehearing Order").

As a natural gas producer, Range has long-term firm service agreements with two interstate natural gas pipeline companies, Columbia Gulf and Intervenor ISO Respondent Texas Eastern ("Texas Eastern"), that give it the right to

transport 200,000 dekatherms of natural gas through the Adair Interconnect every day. Range pays reservation charges to ensure that capacity will be available as needed. Range's gas first flows through Texas Eastern's pipeline system to the Adair Interconnect in Kentucky, then it continues downstream through Columbia Gulf's pipeline system.

Petitioners Columbia Gulf and Range brought administrative complaints against Texas Eastern under 18 C.F.R. § 385.206, asking FERC to require that Texas Eastern ensure its pipeline system's operating pressure is sufficiently high to move the gas into Columbia Gulf's pipeline system. FERC dismissed Petitioners' complaints and denied their requests for rehearing because they failed to demonstrate in their complaints that Texas Eastern had any minimum delivery pressure obligation. Petitioners now appeal. This Court has jurisdiction under 15 U.S.C. § 717r(b). For the reasons explained below, we deny the Petitions for Review.

## I.

## A.

The Natural Gas Act ("NGA") gives FERC "exclusive jurisdiction over the transportation and sale of natural gas in interstate commerce for resale." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300–01 (1988) (citing *Northern Natural Gas Co. v. State Corp. Comm'n of Kan.*, 372 U.S. 84, 89 (1963)).

Under the NGA, a natural gas company's rates and charges "for or in connection with the transportation or sale of natural gas subject to [FERC's jurisdiction], and all rules and regulations affecting or pertaining to such rates or charges, shall be just and reasonable." 15 U.S.C. § 717c(a). If the Commission finds a rate to be "unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall

determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force[.]" *Id*. § 717d.

**B.**

In order to move gas from one pipeline system into another, the delivering pipeline's pressure must be higher than that of the receiving pipeline. Pipeline systems generally use compressor stations to boost the gas's pressure and help keep it flowing through the pipeline. *See, e.g., Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1312 (D.C. Cir. 2015) (citation omitted) (explaining the relationship between a compressor station and flow rates). During two time periods in 2019 and 2021, Range's gas could not move from Texas Eastern's pipeline system into Columbia Gulf's pipeline system because Texas Eastern's pipeline system had a lower operating pressure than Columbia Gulf. Range claims that the lack of gas flow between the two pipeline systems cost it more than $5.5 million. The question presented by this appeal is which parties—Range, Texas Eastern, and/or Columbia Gulf—are responsible for maintaining the relative pipeline pressures necessary to keep the gas flowing between the two systems.

Texas Eastern's pipeline system has three transmission pipelines (Line No. 10, Line No. 15, and Line No. 25). Their Maximum Allowable Operating Pressure ("MAOP") is 936 pounds per square in gauge ("psig"). Columbia Gulf's pipeline system is similarly comprised of three pipelines (Line 100, Line 200, and Line 300). While Line 100 has a MAOP of 935 psig, the lines that receive Range's gas—Line 200 and Line 300—have a MAOP of 1,007 psig. A pipeline usually operates at a lower pressure than its MAOP. Columbia Gulf attests, for example, that its typical prevailing pressure on Line 200 and Line 300 during the relevant time periods ranged between 650

and 850 psig, which, historically, had been low enough to allow gas to flow from the higher-pressure pipelines on Texas Eastern's system.

In 2019 and 2020, Texas Eastern had line failures that led to releases of gas near the Adair Interconnect. The Pipeline and Hazardous Materials Safety Administration ("PHMSA") responded to both line failures by ordering operating pressure restrictions. After the first line failure on August 1, 2019, PHMSA issued an order restricting Texas Eastern from operating the line segments to the Adair Interconnect above eighty percent of the actual operating pressure prior to the line failure event.

PHMSA's restriction prevented Texas Eastern from operating its lines above 740 psig. After the second line failure on May 4, 2020, PHMSA issued an order that kept the same operating pressure restriction and required Texas Eastern to do remediation work. After Texas Eastern completed its required remediation work, PHMSA granted Texas Eastern permission to conduct operations at full MAOP but required Texas Eastern to request approval every ninety days. PHMSA did not approve Texas Eastern's second ninety-day request, so Texas Eastern had to operate two of the three lines at again no greater than 740 psig, starting on June 1, 2021. For efficiency reasons, Texas Eastern decided to reduce the third line's operating pressure as well.

Around the times of Texas Eastern's line failures and PHMSA restrictions in 2019 and 2021, Columbia Gulf curtailed gas flows at the Adair Interconnect because Texas Eastern could not meet Columbia Gulf's prevailing pressure, which averaged 683 psig and reached as low as 553 psig during the 2019 Curtailment.

Foreshadowing the first curtailment at issue, Columbia Gulf sent critical notices in August 2019 about a significant pressure imbalance between its pipeline system and Texas Eastern's pipeline system. On November 5, 2019, Columbia Gulf reduced nominations, or the amount of gas that moves into its pipeline system, from 200,000 dekatherms a day to 60,000 dekatherms a day. Six days later, its nominations went back up to 200,000 dekatherms a day.

Again in 2021, Columbia Gulf and Texas Eastern's parent company, TC Energy Corporation, notified Range that Columbia Gulf would likely need to reduce nominations due to pressure issues. Columbia Gulf posted a critical notice and initially reduced the receipt point capacity to 140,000 dekatherms—and eventually all the way down to zero dekatherms. The second curtailment began on May 27, 2021, and the following day, Texas Eastern declared *force majeure*, an unforeseeable event that prevents a party from performing its contractual obligations. PHMSA rejected Texas Eastern's second ninety-day request to conduct operations at full MAOP around that time.

For twenty-three days, no gas moved from Texas Eastern's pipeline system into Columbia Gulf's pipeline system. The receipt point capacity went up to 100,000 dekatherms a day in the beginning of July and to 140,000 dekatherms a day at the end of July. By the end of July, PHMSA had approved Texas Eastern's request to conduct operations at full MAOP again. The 2021 curtailment ended on July 29, 2021. Texas Eastern then lifted the *force majeure* declaration on August 5, 2021.

## C.

Columbia Gulf and Range raised two separate claims in their joint administrative complaint against Texas Eastern ("Joint Complaint"). First, they alleged Texas Eastern failed to

comply with the Natural Gas Act ("NGA"), FERC's regulations, and Texas Eastern's certificate obligations by not delivering scheduled and confirmed volumes into Columbia Gulf's system during the 2019 and 2021 curtailments. Second, they alleged Texas Eastern violated FERC precedent by not making any necessary modifications to its system that would allow it to maintain and operate the pipelines at sufficiently high pressures.

Range also filed a separate administrative complaint, seeking additional remedies that apply only to Range and not to Columbia Gulf. One of the arguments was that Texas Eastern owes Range credits for the so-called "reservation charges" that Range paid to guarantee pipeline capacity in Texas Eastern's system during the 2019 and 2021 curtailment periods. Range said Texas Eastern's failure to do so violated the reservation charge credit obligations under the Texas Eastern Tariff, which requires a reservation charge adjustment where non-*force majeure*-related outages result in a pipeline failing to deliver the gas a customer has nominated for that day.

After FERC dismissed the complaints and denied both requests for rehearing, Petitioners timely sought review of these FERC orders. Petitioners make three main arguments before this Court: (1) FERC erred in dismissing their arguments regarding Section 6.2 of the Texas Eastern Tariff and Section 4.02(e) of the Adair Interconnection Agreement on procedural and substantive grounds; (2) FERC departed from its precedent without providing required justification; and (3) FERC needed, but failed, to hold an evidentiary hearing on disputed factual issues.

## II.

We must first determine whether petitioners have Article III standing. The parties do not dispute that Range has

standing, and we agree. Range seeks money damages for an alleged $5.5 million in losses from past curtailments, and avers that it stands to lose more from future curtailments likely to occur due to Texas Eastern's chronically low pressure levels.

FERC argues that Columbia Gulf lacks standing to seek prospective relief—here, a FERC order requiring Texas Eastern to "meet its firm service obligations" and "modify or build additional compression" as necessary to keep gas flowing between Texas Eastern and Columbia Gulf's systems. J.A. 49–50 (Joint Compl. ¶ 91). But we conclude that Columbia Gulf, along with Range, has standing to seek such relief.

"To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010)). In order for an injury to be fairly traceable to the challenged conduct, Petitioner must demonstrate that the challenged conduct "triggered additional . . . harm or additional . . . responsibility." *CTS Corp. v. EPA*, 759 F.3d 52, 58 (D.C. Cir. 2014) (emphases removed).

Courts assess standing based on the facts as they existed at the time the action commenced. *Entergy Servs., Inc. v. FERC*, 391 F.3d 1240, 1245 (D.C. Cir. 2004); *Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000). In this case, the action commenced when Columbia Gulf sought relief from this Court.

Along with its initial brief before this Court, Columbia Gulf submitted an affidavit by Edgar Trillo, who has been managing the pipeline pressure issues at the Adair Interconnect on behalf of Columbia Gulf. The affidavit details Columbia Gulf's injuries, both from the past curtailments and future

curtailments. Per the affidavit, the 2019 and 2021 curtailments at issue in this case resulted in operational, administrative, and financial injuries for Columbia Gulf. As part of this process, Columbia Gulf had to take additional gas from other interconnected pipelines, use third-party gas storage, and constantly communicate with customers and other pipelines. Columbia Gulf also had to issue administrative notices to its customers as to its impending underperformance and possible reduction in scheduled deliveries. Contrary to Texas Eastern's later claim that Columbia Gulf did not experience financial injuries from the past curtailments, Columbia Gulf avers that it has been dealing with late charges and collection of unpaid invoices from the past curtailments. As of December 27, 2022, Range had "close to $1.5 million in unpaid invoices to Columbia Gulf for its inability to use the capacity during the curtailments." Trillo's Affidavit at P 8.

Drawing on its experiences with past curtailments, Columbia Gulf alleges that similar curtailments are likely to occur in the future and that, when they do, Columbia Gulf will again suffer operational, administrative, and financial injuries, as it did in 2019 and 2021. Columbia Gulf also alleges that it is experiencing present, or ongoing, injuries from its costly efforts to mitigate the imminent risk of additional curtailments, such as by compressing Texas Eastern's gas before it enters Columbia Gulf's system. To do that, Columbia Gulf has to operate its system in an abnormal mode and isolate a section of its Line 200 to act as a low-pressure receiver of Texas Eastern's low-pressure gas before raising the received gas to Columbia Gulf's prevailing line pressures through the system's compressor units. Abnormal mode operations impose burdens on the gas controller, who must monitor the gas flows and manually flip the valve switch. When operating in the abnormal mode, compressor units have longer run times and, as a result, require "more frequent service intervals, additional

work hours for operations personnel, and [more fuel.]" Trillo's Affidavit at P 11.

The injuries related to mitigating the risk of future curtailments constitute injuries in fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (explaining that "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur" (quoting *Clapper*, 568 U.S. at 414 n.5) (internal quotation marks omitted)); *In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d 42, 59 (D.C. Cir. 2019) ("Because . . . Plaintiffs adequately allege a substantial risk of future [harm], any expenses they have reasonably incurred to mitigate that risk likewise qualify as injury in fact."); *Clapper*, 568 U.S. at 414 n.5 ("[W]e have found standing based on a 'substantial risk' that the harm will occur, which may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm." (quoting *Monsanto Co.*, 561 U.S. at 153)).

Given the recurring past problems with Texas Eastern's pressure levels and lack of any material change to suggest they are resolved, there is a substantial risk of additional curtailments in the future. This makes the ongoing injuries incurred to mitigate that risk, as well as the imminent future risks associated with future curtailments, cognizable as injuries in fact. *See In re U.S. Off. of Pers. Mgmt. Data Sec. Breach Litig.*, 928 F.3d at 59. A recent change in circumstances has further increased the risk of future curtailments. Columbia Gulf's Louisiana Xpress Project, which FERC approved in 2020, began operating in October 2022. As a result of that project, which added new compressor stations for Columbia Gulf's pipeline system at the Adair Interconnect, Columbia Gulf does not have as much excess capacity to consistently conduct operations in the abnormal mode. To conduct abnormal mode operations, and related mitigating efforts,

Columbia Gulf must transport a much lower volume of gas in the southbound direction than the actual volume it is designed to transport in that direction. In July–August 2022, when the Petitions for Review were filed, Columbia Gulf knew that, within a few months, because of the Columbia Gulf Xpress Project, it would no longer be able to operate its system in the abnormal mode consistently "without shorting customers who do not require special help to get into our pipeline." Trillo's Affidavit at P 12.

As Texas Eastern's low pressure levels will likely cause additional curtailments and have resulted in costly efforts by Columbia Gulf to mitigate the risk of additional curtailments, the traceability requirement is met here. *See Orangeburg, S.C. v. FERC*, 862 F.3d 1071, 1080 (D.C. Cir. 2017) (explaining that the traceability element "examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff").

If we determine that Texas Eastern is obligated to increase its pressure levels in order to move the gas into Columbia Gulf's pipeline system—and if FERC orders Texas Eastern to increase its pressure levels—that would reduce the likelihood of future curtailments and redress Columbia Gulf's and Range's injuries relating to the current risk of future curtailments. *See Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) ("Redressability examines whether the relief sought, assuming that the court chooses to grant it, will likely alleviate the particularized injury alleged by the plaintiff.").

## III.

As both Petitioners have standing, we now turn to the challenged FERC orders. The Court reviews FERC orders and

actions under the Administrative Procedure Act's arbitrary and capricious standard. 5 U.S.C. § 706(2)(A). The scope of review under that standard is narrow, and the Court may not substitute its own judgment for that of the agency. *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). "Rather, the court must uphold [an agency action] if the agency has 'examine [d] the relevant [considerations] and articulate[d] a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id*. (alterations in original) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)).

## A.

Petitioners claim that Texas Eastern is obligated to deliver gas to the Adair Interconnect at sufficient pressure to allow the gas to flow, without further assistance or compression, into Columbia Gulf's pipeline. They ground that claim in a provision of the Texas Eastern Tariff and a separate provision of the Adair Interconnection Agreement governing Texas Eastern's and Columbia Gulf's responsibilities at the Adair Interconnect.[1]

---

[1] For this claim, Petitioners also relied on Section 13(b) of the Columbia Gulf Tariff, which states the following:

> Shipper shall deliver gas or cause gas to be delivered to Transporter at the receipt points at a pressure sufficient to allow the gas to enter Transporter's pipeline as such pressure shall vary from time to time. Transporter shall not be required to compress into its pipeline gas transported under any Rate Schedule or otherwise change its normal pipeline operations.

J.A. 33. However, Petitioners do not ask us to review FERC's conclusion on Section 13(b)—that the provision does not apply because it concerns shippers and Texas Eastern is not a shipper. Instead of challenging that conclusion, Petitioners argue that FERC

FERC reasonably dismissed Range's argument regarding Section 6.2 of the Texas Eastern Tariff ("Section 6.2") and both Petitioners' argument regarding Section 4.02(e) of the Adair Interconnection Agreement ("Section 4.02(e)") due to pleading deficiencies. FERC regulations require an administrative complaint to "[c]learly identify the action or inaction which is alleged to violate applicable statutory standards or regulatory requirements" and "[e]xplain how the action or inaction violates applicable statutory standards or regulatory requirements[.]" 18 C.F.R. § 385.206(b) (2021). As explained below, Petitioners failed to satisfy these requirements for their Section 6.2 and Section 4.02(e) arguments.

Even though Petitioners discussed Section 6.2 and Section 4.02(e) at the rehearing stage, FERC reasonably concluded that those discussions came too late. FERC "has long held that it will reject new arguments on rehearing that could have been made originally but were not." *La. Pub. Serv. Comm'n*, 172 FERC ¶ 61,056, P 38 (2020) (internal quotations and citations omitted). Because FERC rules prohibit other parties from filing answers at the rehearing stage, "new arguments at the rehearing stage raises concerns of fairness and due process." *Id*.; *see also* 18 C.F.R. § 385.713(d)(1) (2019).

**1.**

Range's Complaint mentions Section 6.2 of the Texas Eastern Tariff twice. The background section contains a quote of the full text of Section 6.2. J.A. 288 (quoting Section 6.2 of the Texas Eastern Tariff). In the argument section, Range referred to Section 6.2 again once in the following paragraph:

failed to distinguish or knowingly abandon its precedent in *Northern Natural Gas Co. v. ANR Pipeline Co.*, 109 FERC ¶ 61,201 (2004), which they read to stand for the proposition that the term "shipper" includes delivering pipelines. We discuss this argument more below.

Texas Eastern breached its obligations under Contract No. 911376-R2 when Texas Eastern failed to deliver gas to the Adair Interconnect at minimum pressures sufficient for gas to enter into Columbia Gulf. Contract No. 911376-R2 requires Texas Eastern to deliver gas "at such pressure available at pipeline's facilities at the point of delivery not to exceed the maximum allowable pressure of the pipeline." *Moreover, Section 6.2 of the [General Terms and Conditions] of Texas Eastern's tariff requires Texas Eastern to deliver gas at pressures that 'are available at the Point of Delivery and resulting from Pipeline maintaining a discharge pressure of 750 pounds per square inch gauge pressure at the nearest upstream compressor station.'* As noted in the Paragraph 37 of the Facts Section of the Joint Complaint (Appendix A), at no point during the Curtailments did the average of Columbia Gulf's system pressure at the Adair Interconnect exceed Texas Eastern's MAOP for the 30-Inch System, even assuming that all three lines were reduced to 80 percent of MAOP (748.8 psig). Accordingly, Texas Eastern's inability to deliver scheduled and confirmed volumes at Adair during the Curtailments violated the express provisions of Contract No. 911376-R2 and Texas Eastern's tariff.

J.A. 291–92 (emphasis added) (quoting Section 6.2 of the Texas Eastern Tariff).

FERC found in its Initial Order that Section 6.2 required Texas Eastern to deliver gas at its own available line pressures,

and did not require delivery at pressures sufficient to enter Columbia Gulf's system. According to FERC, Section 6.2 gives Range the ability to include minimum delivery pressure obligations in the service agreement, but Range did not do so.

Range argued on rehearing that FERC failed to examine whether Texas Eastern satisfied the requirement in Section 6.2 that it "maintain[] a discharge pressure of 750 pounds per square inch gauge at the nearest upstream compressor station[.]" J.A. 893 (emphases removed) (quoting Section 6.2 of the Texas Eastern Tariff). FERC said it was not required to do so because Range had not sufficiently pleaded its Section 6.2 argument in its complaint.

FERC reasonably decided that it was not sufficient for Range to simply quote the text of Section 6.2 and allege a general violation of the Texas Eastern Tariff. Under 18 C.F.R. § 385.206, Range needed to explain in its complaint how Texas Eastern violated Section 6.2 of its tariff. Range did none of that.

Throughout its complaint, Range focused on the pressure obligations that Texas Eastern has at the Adair Interconnect. But Section 6.2's 750 psig requirement does not apply to the Adair Interconnect. Instead, it concerns pressure levels at the Danville Compressor Station, the nearest upstream compressor station. Not once did Range's Complaint allege that Texas Eastern failed to satisfy its pressure obligations at the Danville Compressor Station. Nor did Range's Complaint explain the connection between Texas Eastern's obligations at the Danville Compressor Station, as outlined in Section 6.2, and at the Adair Interconnect. Given Range's failure to discuss these details and to plead its Section 6.2 argument adequately, FERC permissibly declined to consider Range's Section 6.2 argument on the merits.

**2.**

Section 4.02(e) of the Adair Interconnection Agreement permits either party to "operate their respective pipelines up to its MAOP at any time" and states that "both Parties must, in order to be assured of having the physical capacity to deliver/ receive gas through the Interconnection, have the capacity of delivering/ receiving gas to such MAOP." J.A. 429.

In the background section of their Joint Complaint, Petitioners quoted excerpts of the Adair Interconnection Agreement, including Section 4.02(e), but made no arguments as to its application. FERC noted in passing in its Initial Order that the Adair Interconnection Agreement does not impose an obligation on Texas Eastern to transport gas at a specific pressure. On rehearing**,** Columbia Gulf argued that FERC only looked to the first sentence of Section 4.02(e) and disregarded the rest of it, including the requirement for Texas Eastern to have the capacity to deliver gas at Columbia Gulf's MAOP. As with Section 6.2 of the Texas Eastern Tariff, FERC said it did not need to examine this argument because Petitioners did not raise it in the Joint Complaint. FERC also reiterated its position that Section 4.02(E) "does not require that Texas Eastern operate at any minimum pressure in order to ensure that Columbia Gulf will accept receipt of Texas Eastern's deliveries (or that it deliver gas at Columbia Gulf's MAOP)[.]" J.A. 966.

FERC permissibly declined to consider Petitioners' Section 4.02(e) argument on rehearing. In the Joint Complaint, Petitioners only touched on Section 4.02(e) once in the background section and did not mention it in the argument section when they identified the actions that allegedly violated applicable statutory or regulatory requirements. Nowhere in the Joint Complaint did Petitioners allege that Texas Eastern violated Section 4.02(e) of the Adair Interconnection Agreement.

Nevertheless, Petitioners now argue that the Court should put aside the pleading defect and decide the merits of the Section 4.02(e) argument, then have FERC decide on remand whether to allow Petitioners to fix the procedural defect. Petitioners hope that this Court's hypothetical reversal—of FERC's decision to reject the Section 4.02(e) argument on the merits—would lead FERC to change course and refrain from dismissing the argument on a procedural basis. According to Petitioners, FERC should not be able to use procedural defects that could be easily cured to dodge judicial review of its other conclusions on the merits.

Those arguments are at odds with our precedent. We have made it clear that we "will not grant 'relief on the merits' when the Commission has 'properly dismissed the pleading on procedural grounds.'" *NTCH, Inc. v. FCC*, 950 F.3d 871, 883 (D.C. Cir. 2020) (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183 (D.C. Cir. 2003)).

Here, FERC dismissed Petitioners' Section 4.02(e) argument on both procedural and substantive grounds. FERC reached both conclusions separately. FERC found on rehearing that Petitioners did not timely raise their Section 4.02(e) argument, then explained why the argument also fails on the merits. FERC did not suggest that the procedural grounds dismissal was in any way contingent on its dismissal of the Section 4.02(e) argument on the merits. Petitioners have not otherwise demonstrated why that is the case. As FERC properly dismissed Petitioners' Section 4.02(e) argument on separate procedural grounds, this Court has no reason to consider the argument on the merits.

**B.**

Petitioners next argue that FERC made an unexplained departure from its precedent in *Northern Natural Gas Co. v.*

*ANR Pipeline Co.*, 109 FERC ¶ 61,201 (2004), by dismissing Petitioners' allegations that Texas Eastern violated its own pressure obligations.

In that case, Northern Natural, the delivering pipeline, asked FERC to order ANR, the receiving pipeline, to fix the impending pressure issue after ANR underwent a project expansion that would increase its pipelines' operating pressure levels. FERC denied Northern Natural's request, and pointed to the ANR Tariff, which requires "Northern Natural, the shipper, to deliver gas to ANR, the transporter, 'at a pressure sufficient to allow the Gas to enter Transporter's existing pipeline system[.]'" *Id.* ¶ 61,958, P 14 (quoting the ANR Tariff). Ultimately, FERC found that ANR's expansion, and increase in operating pressure levels, did not violate the ANR Tariff. *Id.* ¶ 61,960.

Petitioners claim that *Northern Natural* set a default rule that a delivering pipeline, such as Texas Eastern, has a legal obligation to deliver gas at a sufficient pressure to enter the receiving pipeline. They also argue that under *Northern Natural*, Texas Eastern is a shipper and bound by the Columbia Gulf Tariff's similar language on minimum pressure obligations for shippers. FERC reasonably concluded that both arguments are without merit. *Northern Natural* does not require FERC to find that Texas Eastern has minimum pressure obligations at the Adair Interconnect.

FERC adequately explained that *Northern Natural* did not establish a default rule on a delivering pipeline's obligations. There, the delivering pipeline asked FERC to issue an order to the receiving pipeline. Disagreeing with the request, FERC declined to do so. FERC only examined the receiving pipeline's obligations and did not decide on the delivering pipeline's obligations, nor did it order the delivering pipeline to modify its system to fix the pressure issue. Here, Columbia

Gulf, the receiving pipeline, asked FERC to issue an order to the delivering pipeline, Texas Eastern, to increase its delivery pressure. FERC reasonably distinguished *Northern Natural* from the instant case on that basis. The key holding in *Northern Natural* was only that the receiving pipeline did not have an obligation to lower its pressure in order to receive gas from the delivering pipeline.

Furthermore, petitioners have not established that Texas Eastern is bound by the Columbia Gulf Tariff's language on minimum pressure obligations for shippers. In *Northern Natural*, FERC looked to the receiving pipeline's tariff language on shippers' pressure obligations to conclude that the receiving pipeline did not violate any pressure obligations. Although the receiving pipeline argued that the delivering pipeline is a shipper and thus is subject to shippers' pressure obligations in the receiving pipeline's tariff, *id.* ¶ 61,957–58, P 14, FERC did not adopt that reasoning. FERC reasonably found that its holding in *Northern Natural* was limited to the receiving pipeline's obligations and reasonably concluded that Texas Eastern is not a shipper subject to pressure obligations under the Columbia Gulf Tariff.

As FERC explained in its Initial Order, when it stated in *Northern Natural* that "the responsibility to deliver gas at a pressure sufficient to allow the gas to enter [the receiving pipeline's] system rests with [the delivering pipeline,]" *id.* ¶ 61,960, P 23, it was merely saying that "in the absence of any contractual obligations between the parties concerning line pressure, the financial burden was on the party who required delivery at a specific line pressure," J.A. 870–71. We agree. It did not, either explicitly or implicitly, hold that a delivery pipeline is obligated to deliver at a pressure above that of the receiving pipeline.

20

**C.**

The next question for this Court is whether FERC needed, but failed, to hold an evidentiary hearing to resolve two factual disputes: Whether Texas Eastern provided Range and other shippers on Texas Eastern's system equal service and whether a *force majeure* event actually occurred in 2021.

In general, FERC has broad discretion to determine whether to hold an evidentiary hearing. *Blumenthal v. FERC*, 613 F.3d 1142, 1144 (D.C. Cir. 2010). "It is well established … that 'mere allegations of disputed facts are insufficient to mandate a hearing; petitioners must make an adequate proffer of evidence to support' their claim." *Id.* at 1144 (quoting *Cerro Wire & Cable v. FERC*, 677 F.2d 124, 128 (D.C. Cir. 1982)). No evidentiary hearing is required if FERC can adequately resolve the disputed issues on the written record. *See Sacramento Mun. Util. Dist. v. FERC*, 474 F.3d 797, 804 (D.C. Cir. 2007).

As explained below, FERC did not arbitrarily and capriciously fail to conduct an evidentiary hearing to resolve either factual dispute.

**1.**

In their joint administrative complaint, Petitioners alleged a violation of 18 C.F.R. § 284.7(b)(2), which requires pipelines providing "transportation service on a firm basis . . . [to] provide each service on a basis that is equal in quality for all gas supplies transported under that service[.]" 18 C.F.R. § 284.7(b)(2). Petitioners argued that Texas Eastern provided "a lower priority of service" to Range at the Adair Interconnect "while providing significantly greater service to geographically proximate delivery points." J.A. 39. Range did not know of "similar pressure issues at other pipeline interconnects on the Texas Eastern system during the 2019

Curtailment." J.A. 39. Its analysis also showed that volumes at three points immediately upstream and downstream of the Adair Interconnect (Owingsville, Danville, and Tompkinsville) did not drop below 75 percent of MAOP during the 2021 curtailment.

FERC explained in its Initial Order that Range could not have received lower priority service in violation of 18 C.F.R. § 284.7(b)(2) when Range is the only shipper at the Adair Interconnect and has a contract for all the capacity there. Petitioners also compared the Adair Interconnect with geographically proximate meter stations, not interconnects. As meter stations and interconnects are different, FERC found the comparison to be unconvincing.

Range contended on rehearing that FERC ignored its precedent in *El Paso Natural Gas Co.*, 99 FERC ¶ 61,244 (2002), where it treated firm shippers with different transportation paths as similarly situated. Arguing that this precedent conflicts with FERC's conclusion that Range did not receive lower priority service and FERC's related decision to disregard other firm shippers receiving greater service from Texas Eastern, Range said FERC should hold an evidentiary hearing to examine similarities between Range and other shippers receiving service from Texas Eastern.

In its Rehearing Order, FERC declined Range's request and clarified that it did not reject Range's lower priority argument and find that other shippers are not similarly situated because of other shippers' different transportation paths. Instead, FERC concluded that other shippers' delivery points being "geographically proximate" to the Adair Interconnect is insufficient to make these shippers similarly situated as Range.

According to Petitioners, FERC erred in "requiring Range to provide—without the benefit of an evidentiary hearing and

the discovery process that goes along with it—facts about operational circumstances on Texas Eastern's pipeline that were solely within Texas Eastern's possession" in order to demonstrate its similarities to other shippers at nearby meter stations. Petitioners' Opening Br. 53; Petitioners' Reply Br. 26.

We disagree. FERC reasonably concluded that geographic proximity alone is insufficient to make other shippers similarly situated and that Range failed to meet its burden to show why it is similarly situated to other firm shippers. Shippers with geographically proximate delivery points can still be different from each other. Even though only Texas Eastern has specific information about its pipeline, Range still needed to make a prima facie case for an evidentiary hearing and did not do so. Range did not identify what it hoped to obtain from discovery, explain how such findings would help support its similarly-situated argument, or discuss the likelihood of such findings. *See, e.g., Braintree Elec. Light Dep't v. FERC*, 550 F.3d 6, 13 (D.C. Cir. 2008) (explaining that "[t]he mere possibility" of a claim "neither undermines FERC's conclusions nor calls for additional procedures beyond the 'paper hearing'").

Range also relies on the following language by FERC in *El Paso*: "It is inconsistent with [18 C.F.R. § 284.7(b)(2)] for firm shippers to be charged for firm service and have service reduced through pro rata allocations on a non-emergency basis so that the pipeline can provide service to another shipper." 99 FERC at ¶ 62,001. Reading *El Paso* broadly, Range says it stands for the proposition that "a firm shipper must be able to reliably schedule its firm contractual entitlements without service interruptions." Petitioners' Opening Br. 53. But *El Paso* does not contain such broad language. Instead, it focused on the issue of routine service reductions that a pipeline implemented to deal with insufficient capacity for all of its firm service obligations. *El Paso*, 99 FERC at ¶ 62,001. That is not

the issue here. Service reductions occurred here due to the pressure issue, instead of insufficient capacity. FERC reasonably distinguished *El Paso*, which tied its prohibition on service reductions to those that take place in order to provide service to other shippers.

**2.**

In its administrative complaint, Range argued that Texas Eastern must provide full reservation charge credits to Range for both curtailment periods. Range said Texas Eastern's failure to do so violated the reservation charge credit obligations in the Texas Eastern Tariff.

FERC clarified in its Initial Order that Texas Eastern did provide reservation charge credits to Range for the volumes that Texas Eastern did not schedule and could not deliver due to *force majeure* restrictions. The issue was whether Texas Eastern also had to provide credits for scheduled volumes during curtailment periods that Columbia Gulf did not confirm due to the pressure issue. According to FERC, Range was not entitled to those credits. FERC held that, under Section 31.3 of the Texas Eastern Tariff, Range is generally not entitled to reservation charge credits for the times Texas Eastern fails to deliver the gas if the failure is due to Columbia Gulf's conduct, including its refusal to receive the gas, and such conduct is outside Texas Eastern's control. FERC also noted that Range has withheld the payment of reservation charges for which it is requesting credits.

Range then argued on rehearing that FERC needed, but failed, to sufficiently examine the legitimacy of Texas Eastern's *force majeure* declaration in 2021. According to Range, because a *force majeure* event is the only available basis for reservation charge credits under Section 31.2 of the Texas Eastern Tariff, FERC needed to examine Texas

Eastern's 2021 *force majeure* declaration to determine whether Texas Eastern properly invoked Section 31.2. Range alleged that Texas Eastern improperly declared *force majeure*. In response, FERC reiterated that the 2021 *force majeure* declaration is irrelevant to the question of whether Range is entitled to additional reservation charge credits because Texas Eastern was willing to deliver the volumes, for which Range is now seeking credits, during the *force majeure* event, but Columbia Gulf declined to confirm them due to the pressure issue.

Range requested an evidentiary hearing on the 2021 *force majeure* event for the first time in their briefs before us, instead of during administrative proceedings. Range also explained for the first time that Section 31.2 has a ten-day safe harbor for *force majeure* events and so the legitimacy of the 2021 *force majeure* declaration impacts Range's ability to collect ten extra days of reservation credits. As Range failed to raise this argument before FERC, we lack jurisdiction to consider it. *See* 15 U.S.C. § 717r(b) ("No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do.").

FERC reasonably rejected Range's more general *force majeure* argument that it made during administrative proceedings. Putting aside Range's later explanation to us about the ten-day safe harbor in Section 31.2, which we lack jurisdiction to consider, FERC reasonably determined that Range failed to demonstrate why the 2021 *force majeure* declaration, even if invalid, would have made a difference regarding the relief to which Range claimed to be entitled.

**IV.**

For the foregoing reasons, we deny the Petitions for Review.

*So ordered.*